IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| DEVODERICK RAYSHON JONES, | ) | |
| ID # 1035138, | ) | |
| Petitioner, | ) | |
| vs. | ) | No. 3:04-CV-1596-D (BH) |
| | ) | ECF |
| NATHANIEL QUARTERMAN,[1] Director, | ) | Referred to U.S. Magistrate Judge |
| Texas Department of Criminal | ) | |
| Justice, Correctional Institutions Division, | ) | |
| Respondent. | ) | |

FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of 28 U.S.C. § 636(b), and an order of the Court in implementa-

tion thereof, subject cause has previously been referred to the United States Magistrate Judge. The

findings, conclusions, and recommendation of the Magistrate Judge are as follows:

## I.  BACKGROUND

### A.  Nature of the Case

Petitioner, an inmate currently incarcerated in the Texas Department of Criminal Justice -

Correctional Institutions Division (TDCJ-CID), filed the instant petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 to challenge his conviction for capital murder in Cause No. F01-

00219-QN.  Respondent is Nathaniel Quarterman, Director of TDCJ-CID.

### B.  Procedural and Factual History

On January 20, 2000, the State indicted petitioner for the capital murders of Rickey Hunt

Jr. (Hunt) and Corey Jackson (Jackson).  CR[2] at 2 (indictment).  *See Jones v. State*, No. 05-01-00497-

---

[1]  On June 1, 2006, Nathaniel Quarterman became the Director of the Texas Department of Criminal Justice - Correctional Institutions Division.  The Court thus substitutes him for Douglas Dretke.  *See* Fed. R. Civ. P. 25(d)(1).

[2]  "CR" refers to the Clerk's Record in Cause No. F01-00219-QN.

CR, 2002 WL 31554408, at *1 (Tex. App. – Dallas Nov. 19, 2002, pet. ref'd) (setting out general background information).  It is undisputed that Hunt (also known as "Junior" or "J.R."), Jackson, and Hunt's brother, Rickey Stradford (Stradford), were murdered during an attempted drug purchase in Dallas County on January 16, 2000, and their bodies were dumped in a nearby field and covered with a mattress.  The central dispute at trial was the extent of the involvement of petitioner (also known as "D") in the murders, if any.

The State presented numerous witnesses and exhibits at trial.  *See generally* Rep.'s R., Vol. III, IV, V, and VII [hereinafter cited as RR-volume # at page].  It presented testimony about a first meeting regarding the purchase of cocaine on January 16, 2000, during which Montray Bynum (Bynum), also known as "Little Man", and Hunt approached Tim Williams (Tea-Leaf)[3] regarding such purchase.  RR-III at 32-35 (testimony of Bynum); 106-07 (testimony of Tea-Leaf); RR-IV at 48 (testimony of Tea-Leaf's girlfriend Pam James).  Tea-Leaf referred Bynum and Hunt to Adam Woods (Woods), also known as "K-D".  RR-III at 36, 107-08; RR-IV at 48.  Bynum recalled that Byron Briscoe was also present, and that Hunt used Briscoe's cell phone to call Stradford regarding funding for the purchase.  RR-III at 37.  He testified that others may have been present, but he was not focused on who was there.  *Id.*  Others testified that those present included of Pam James, petitioner's girlfriend (Erica Washington), Kevin Adams, and petitioner.  RR-III at 104-05 (testimony of Tea-Leaf), 181 (testimony of Washington); RR-IV at 46-47 (testimony of James), 232 (testimony of Adams); RR-V at 156 (testimony of Briscoe).[4]  After Woods and Hunt agreed to a

---

[3]  The Court identifies Timothy Williams by his a.k.a., Tea-Leaf, so as to avoid potential confusion with his brother Michael Williams, an alleged eyewitness who was not called to testify at trial.

[4]  Although Washington also testified to the presence of "Jason and his girlfriend on a bike", RR-III at 181, no one else mentioned their presence.  Therefore, their presence is not as clear.

$17,000 purchase price, Bynum and Hunt said they would be back with the money and left.  RR- III at 35-40; 108-09.  Briscoe also left at that point.  *Id.* at 110, 183; RR-IV at 49; RR-V at 160.

Tea-Leaf testified that after Hunt, Bynum, and Briscoe left, he overheard a conversation between Woods and petitioner during which Woods indicated that if Hunt and Bynum returned, "he was going to get them in the house"; petitioner responded that "I'm down with it because I need the money" and "I'm down, cut me in."  *Id.* at 109-12, 149-50.  The State introduced a statement that Tea-Leaf gave to police officers the day after the murders that was consistent with his testimony.  *See id.* at 172; RR-VII (State's Ex. 285).  Tea-Leaf further stated:  "They were talking like they were going to jack these guys."

Hunt met up with Stradford and Jackson, and they proceeded on motorcycles to Woods's home, followed shortly thereafter by Bynum on his bicycle.  RR-III at 41-43.  As the trio arrived, the females left.  *Id.* at 147; RR-IV at 50-51.  At this point the testimony diverged.

Bynum testified that he saw the trio and Tea-Leaf when he arrived.  RR-III at 44.  He also testified that he briefly chatted with Hunt upon his arrival before Woods came out of his house and informed them that they needed to go inside to count the money.  *Id.* at 44-45.  Bynum testified that he lagged back and did not enter the house.  *Id.* at 48.  He did not see petitioner at the crime scene at any point.  *Id.* at 49, 61, 65, and 67-68.  After the others entered the house, he spoke to Tea-Leaf, who seemed to be trying to get him to leave the area.  *Id.* at 50-51.  A minute or so later, gunshots rang out and he ran home.  *Id.* at 51-52.

The State introduced a statement that Bynum gave to police officers on the date of the murders.  *See id.* at 77; RR-VII (State's Ex. 283).  Bynum therein did not mention any drug deal, but indicated that, when he arrived on his bicycle, he saw the trio go in the house with an individual

3

whose description fit Woods.  He also indicated that Tea-Leaf and "another black guy" were near Tea-Leaf's house, and Tea-Leaf tried to get him to leave by saying "Tear your little ass" before the shots rang out.

Tea-Leaf testified that around one o'clock in the afternoon, Hunt's trio arrived on motor-cycles; Woods said he had to make a phone call, and Woods and petitioner went into Woods's house.  RR-III at 113-15.  He also testified that after Woods directed the trio to come into his house to count the money, Woods entered the house followed by the trio and petitioner.  *Id.* at 116.  He testified that Bynum arrived after the trio went into the house, Bynum wanted to go into the house, and he told him that "they were taking care of business and he didn't need to be in there", and that he and Bynum ran off after hearing a series of gunshots.  *Id.* at 117-19.  He further testified that he returned to a point near the crime scene where he observed Woods and petitioner load a body into the back of Woods's truck as well as a mattress.  *Id.* at 121-23.  Tea-Leaf's statement to the police essentially parallels the testimony he gave at trial.  *See* RR-VII (State's Ex. 285).

Washington testified that she and James left so that she could fix her children lunch at petitioner's mother's house, which was nearby.  RR-III at 183-84.  Although her testimony was somewhat confusing regarding petitioner's whereabouts at the time of the gunshots, she ultimately testified that petitioner was not in his mother's house at that time even though he had come to his mother's house for a phone call.  *See id.* at 184-88.  She testified that after the gunshots, she saw petitioner heading back toward the crime scene.  *Id.* at 201.  She also testified that petitioner later told her that he saw blood on "Little Kevin" (Kevin Adams), he saw Jason trembling, Woods asked him to put a mattress in the back of his truck, and then "he seen the bodies."  *Id.* at 192-93, 206-07.  She testified that petitioner never told her who participated in the murders, but he told her he did

4

not do it, and she took his word for it because "he didn't come back up there with no blood on him or nothing else." *Id.* at 207.

James testified that as she and Washington walked to petitioner's mother's house, she glanced back and saw Woods, petitioner, and two of the guys who showed up on motorcycles walking toward Woods's home. RR-IV at 51-52. She testified that she heard gunshots within five minutes of their arrival at petitioner's mother's house. *Id.* at 53. She testified that she went to get her car from that area and saw "one of the little younger guys" (Bynum) running away. *Id.* at 54. She testified that she did not see petitioner go to his mother's house during the time she was there. *Id.* at 57.

John Young, a neighbor who was inside watching a football game, testified that he peeked out the window when he heard the motorcycles, and saw the trio with Tea-Leaf and Adams. RR-III at 219. He also testified that he left the house to get a beer and saw Tea-Leaf with an unnamed person as he did so. *Id.* at 221, 229. He further testified that he heard shots while on his beer-run. RR-III at 221-22.

Adams testified that as he went inside to watch football, he saw Young heading out. RR-IV at 232-34. He testified that he heard shots after watching the game for "no longer than ten or fifteen minutes", looked out the window, saw Tea-Leaf and Bynum running, and followed Tea-Leaf. *Id.* at 235-37. He testified that he and Tea-Leaf attempted to see what was going on, but trees, bushes, and fences made it difficult. *Id.* at 238-39. He testified that he could see a truck, people moving a mattress, and two people leaving in the truck – one of whom appeared to be Woods and the other could have been petitioner but he was not certain. *Id.* at 239-42.

On March 15, 2001, a jury found petitioner guilty as charged in the indictment. RR-VI at

5

50.  The trial court thereafter sentenced him to life imprisonment.  *Id.*  at 51.

On November 19, 2002, the Fifth District Court of Appeals of Texas at Dallas affirmed the conviction.  *Jones v. State*, No. 05-01-00497-CR, 2002 WL 31554408, at *1 (Tex. App. – Dallas Nov. 19, 2002, pet. ref'd).   On January 9, 2004, petitioner filed a state application for writ of habeas corpus.  S.H. Tr.[5] at 2.  On February 23, 2004, the trial court entered findings of fact and conclusions of law relative to petitioner's state habeas application.  *See id.* at 77-81.  Before entering such findings, the court had defense counsel for petitioner submit an affidavit to respond to the allegations against him.  *See id.* at 78 (request for affidavit), 82-83 (submitted affidavit).  On June 2, 2004, the Texas Court of Criminal Appeals denied petitioner's application without written order on findings of trial court without a hearing.  *Ex parte Jones*, No. 58,559-01, slip op. at 1 (Tex. Crim. App. June 2, 2004).

On July 22, 2004, the Court received the instant petition for federal habeas relief and a memorandum concerning petitioner's claim of actual innocence.  Respondent thereafter filed an answer and provided the state-court records.

C.  **Substantive Issues**

In numerous grounds for relief, petitioner raises the following claims:   (1) ineffective assistance of counsel;  (2) insufficient evidence;  (3) erroneous appellate decision;  (4) "judicial misconduct" by the prosecution in allowing witness Michael[6] Williams to be absent from trial;  (5) a false hearing by the habeas court;  (6) the trial court error in appointing only one attorney for him

---

[5]  "S.H. Tr." denotes the state habeas records attached to *Ex parte Jones*, No. 58,559-01, slip op. (Tex. Crim. App. June 2, 2004).

[6]  The various papers filed with the Court spell the name either "Micheal" or "Michael".

6

in this capital murder case; and (7) actual innocence.

## D. Exhaustion

Respondent does not assert exhaustion of state remedies as a defense to this federal habeas petition. (*See* Answer at 4.)

## II. APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000). In this case, no one disputes the applicability of the AEDPA standards to petitioner's claims.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact.

*Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001).  Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  529 U.S. at 407.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact.  *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000).  Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'"  *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000).  The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

With these AEDPA standards in mind, the Court proceeds to address the merits of petitioner's claims.  Because the resolution of some claims impact the resolution of other claims, the

8

Court will address the raised claims in an order different than presented to it.

### III.  ERRONEOUS APPELLATE DECISION

In his eighteenth ground for relief, movant argues that the appellate affirmance of his conviction conflicts with *Jackson v. Virginia*, 443 U.S. 307 (1979).

This claim entitles petitioner to no habeas relief for at least two reasons.  First, petitioner did not present a legal-insufficiency-of-the-evidence claim based on *Jackson* on direct appeal.  *See* Appellate Brief at 28-31.  Petitioner instead raised a factual insufficiency claim under *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996).  Unlike the standard enunciated in *Jackson*, the more exacting *Clewis* standard does not implicate federal constitutional concerns.  *See Woods v. Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002).  The appellate court understandably relied on *Clewis* rather than *Jackson*.

Moreover, this claim is not cognizable under 28 U.S.C. § 2254.  Federal habeas relief cannot be had "absent the allegation by a [petitioner] that he or she has been deprived of some right secured to him or her by the United States Constitution or the laws of the United States."  *Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995).  The courts entertain federal petitions under § 2254 "only on the ground" that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States."  *See* 28 U.S.C. § 2254(a).  Courts cannot grant habeas corpus relief merely because a state prisoner disagrees with an appellate decision or argues that the decision "out of step" with the law.  *See Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999) ("[E]rrors in state postconviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief."); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997) ("infirmities in state habeas [and other post-conviction] proceedings do not constitute grounds for relief in federal court.").  Although the federal

habeas process certainly permits petitioners to pursue alleged constitutional errors that occurred on appeal, it does not permit a separate claim that the appellate decision is "bad" or "out of step" with Supreme Court precedent. The focus of a federal habeas claim under § 2254 is on the validity of the state conviction or sentence, not on a specific appellate ruling. The challenge to the appellate decision does not make a petitioner's incarceration violative of the Constitution or laws or treaties of the United States. Petitioner's challenges to the state post-conviction proceedings merely attack proceedings collateral to his detention and not his detention itself. Accordingly, petitioner's eighteenth ground for relief entitles him to no federal habeas relief.

## IV.  FALSE HABEAS HEARING

As part of his tenth ground for relief, petitioner contends that the habeas court held a false hearing. More specifically, he contends that although an evidentiary hearing was alleged to have been held, the State "bullied" the court with an "affidavit" hearing.

The allegation that the habeas court held any type of hearing on petitioner's state habeas application is not supported by the record. *See* S.H. Tr. at 81 (showing that habeas court specifically found a hearing was "not necessary"); *Ex parte Jones*, No. 58,559-01, slip op. at 1 (Tex. Crim. App. June 2, 2004) (showing that the denial of petitioner's state writ by the Court of Criminal Appeals recognizes that no hearing was held). Moreover, as discussed in the prior section, infirmities in state habeas proceedings do not constitute grounds for relief in federal court. This claim entitles petitioner to no federal habeas relief.

## V.  ACTUAL INNOCENCE

In several of his numbered grounds for relief and his separate memorandum, petitioner asserts that he is actually innocent of the crime for which he has been convicted.

10

With respect to whether a petitioner may obtain federal habeas relief on a claim of actual innocence, the Fifth Circuit Court of Appeals has recognized *Townsend v. Sain*, 372 U.S. 293 (1963), as the unequivocal position of the United States Supreme Court on the matter. *See Boyd v. Puckett*, 905 F.2d 895, 896 (5th Cir. 1990); *Armstead v. Maggio*, 720 F.2d 894, 896 (5th Cir. 1983) (per curiam). In *Townsend*, the Court held that "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." 372 U.S. at 317, *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). In the Fifth Circuit, actual innocence is not an independent basis for federal habeas relief. *E.g., Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998); *Jacobs v. Scott*, 31 F.3d 1319, 1324 (5th Cir. 1994). Petitioner thus cannot succeed on his actual innocence claim standing alone.

Petitioner, moreover, has not established that he is actually innocent. The Supreme Court has held that to show actual innocence, a petitioner must establish:

> that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt . . . in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial.

*Schlup v. Delo*, 513 U.S. 298, 321 (1995).

Petitioner has not met this standard. A jury found him guilty on the evidence presented against him. Petitioner points to no new evidence which exonerates him. He instead relies on a letter that his co-defendant Woods sent his mother prior to trial, in which Woods states:

> I just want to tell you that I don't know who told on [petitioner] but he was not with me on that day. I heard about my so called friends being witness for the state against me. I don't want to write too much and I don't want to call cause they are recording

11

what I say.  I hope [petitioner] get out of this jail cause I know the truth.

*See* Ex. 2-A, attached to Petr.'s Mem.  He also relies on an affidavit from his mother in which she provides background information for the letter from Woods and avers that an investigator (Rex Reynolds) informed her that Michael Williams had given a statement that "he was present the 'entire' time and that he 'knew' for a fact that [petitioner] did not commit this case."  *See id.*  None of this evidence became available only after trial, and none of it was wrongly excluded.  As pointed out by petitioner, his attorney never offered the evidence.

Because a claim of actual innocence is not cognizable on federal habeas corpus, and petitioner has not shown himself to be actually innocent within the meaning of *Schlup* in any event, this claim entitles him to no federal habeas relief.

## VI.  INSUFFICIENCY OF THE EVIDENCE

In his seventeenth ground for relief, petitioner contends that the State convicted him without any proof because it never proved that he was at the scene of the crime or that he was one of the shooters.  He argues that the State's case was merely based upon insinuation and false testimony by Timothy Williams.

Respondent argues that sufficient evidence supports the conviction, and that the claim is procedurally barred in any event because petitioner did not raise the claim on direct appeal and because the habeas court held that such claim could not be raised through the state habeas process.

"A criminal defendant has a federal due process right to be convicted only upon evidence that is sufficient to prove beyond a reasonable doubt the existence of every element of the offense." *Foy v. Donnelly*, 959 F.2d 1307, 1313 (5th Cir. 1992).  Federal courts have extremely limited habeas review of claims based on the sufficiency of the evidence, and the standard for reviewing such claims

12

is supplied by *Jackson v. Virginia*, 443 U.S. 307 (1979). When reviewing such claims against the underlying conviction, the relevant question "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. When "faced with a record of historical facts that supports conflicting inferences [courts] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. Further, under *Jackson*, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). "Determining the weight and credibility of the evidence is within the sole province of the jury." *United States v. Martinez*, 975 F.2d 159, 161 (5th Cir. 1992). Courts view "any required credibility determinations in the light most favorable to the guilty verdict." *United States v. Wise*, 221 F.3d 140, 154 (5th Cir. 2000). They do not "second-guess[] the weight or credibility given the evidence." *United States v. Ramos-Garcia*, 184 F.3d 463, 465 (5th Cir. 1999). The *Jackson* standard applies whether the evidence is direct or circumstantial. *United States v. Scott*, 159 F.3d 916, 920 (5th Cir. 1998).

Federal courts apply the *Jackson* "standard looking to the state's substantive law, giving great weight to the state court's determination." *Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir. 2000). State case law and statutes bind the courts in their determination of the elements needed to be proven. *Foy v. Donnelly*, 959 F.2d 1307, 1313 (5th Cir. 1992). In reviewing a challenge to the sufficiency of the evidence supporting the underlying conviction, "*Jackson* requires . . . that the review occur 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Bledsue v. Johnson*, 188 F.3d 250, 259 (5th Cir. 1999) (quoting *Jackson*, 443 U.S. 324 n.16).

The federal courts must "independently analyze the governing statute, the indictment, and the jury charge to measure the constitutional sufficiency of the evidence and determine what are the *essential elements* required by the *Jackson* sufficiency inquiry." *Id.* at 260. When considering a claim of insufficient evidence to support the underlying conviction on federal habeas review, this Court should only determine "whether the evidence was constitutionally sufficient to convict [petitioner] of the crime charged." *Id.* at 262 (quoting *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991)).

In this case, the State charged petitioner with capital murder. CR at 2. The indictment specifically alleges that, on or about January 16, 2000, in Dallas County, Texas, petitioner did

> unlawfully then and there knowingly and intentionally cause the death of an individual, to-wit: RICKEY HUNT, JR., by shooting said RICKEY HUNT, JR. with a firearm, a deadly weapon, and during the same criminal transaction said defendant did then and there intentionally and knowingly cause the death of another individual to-wit: COREY JACKSON, by shooting said COREY JACKSON with a firearm, a deadly weapon.

*Id.* The trial court, furthermore, read the following charge to the jury:

> Our law provides that a person commits the offense of murder if he intentionally or knowingly causes the death of an individual.
> A person commits capital murder when such person intentionally or knowingly commits murder as defined above and he murders more than one person during the same criminal transaction.
>
> . . .
>
> Our law provides that a person commits the offense of robbery if, in the course of committing theft, as that term is hereinafter defined, and with intent to obtain and maintain control property of another, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.
>
> . . .
>
> "Theft" as used herein is the unlawful appropriation of the corporeal personal property of another, with the intent to deprive such person of said property.
>
> . . .
>
> All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.

14

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  Mere presence alone will not constitute one a party to an offense.

By the term "conspiracy" as used in these instructions, is meant an agreement between two or more persons with intent that a felony be committed, and that they or one or more of them engage in conduct that would constitute the offense and an agreement constituting a conspiracy may be inferred from acts of the parties. You are instructed that robbery is a felony offense.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* at 10-13.  The jury charge is consistent with Texas law regarding the law of the parties, murder, capital murder, robbery, and theft.  *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2) and (b), 19.02(b)(1), and 19.03(a)(7),  29.02(a)(2), 31.03 (Vernon 2003) (the theft provision, § 31.03, was amended in 2001, but such amendments have no materiality in this case due to the facts of the case).

As already mentioned, petitioner challenges the sufficiency of the proof to show that he was present at the scene of the crime or that he was one of the shooters.  In this instance, however, the testimony presented at trial establishes that petitioner was at the scene of the crime with Woods and that he was either a shooter or criminally responsible for the shootings.  The testimony from Tea-Leaf places petitioner inside the house where and when the shootings occurred and shows that petitioner and Woods were working together to either rob or murder Hunt and Jackson.  Testimony from Tea-Leaf and Washington show that petitioner placed a mattress over the bodies after the murders.  The trial evidence suffices to show each of the essential elements of capital murder.  Viewed in a light most favorable to the prosecution, the Court finds that the record supports the jury verdict.  From the evidence, a rational jury could conclude that petitioner was at least a party to the

offense and criminally responsible for the offense.  A rational jury could conclude that petitioner

committed the murders as charged.  A rational trier of fact could have found the essential elements

of capital murder beyond a reasonable doubt.  The Court finds that the evidence was constitutionally

sufficient to convict petitioner for capital murder.

Because the Court finds legally sufficient evidence to support petitioner's conviction, it need

not address respondent's alternative argument that the claim is procedurally barred from federal

habeas review.

## VII.  PROSECUTORIAL MISCONDUCT

In his tenth ground for relief, petitioner contends that the prosecution committed "judicial

misconduct" by allowing a witness, Michael Williams, to be absent from trial.  A prosecutor, how-

ever, engages in no misconduct merely by failing to call a witness at trial.  This claim is frivolous, and

entitles petitioner to no federal habeas relief.[7]

## VIII.  TRIAL COURT ERROR

In his fifteenth ground for relief, petitioner asserts that the trial court erred in appointing only

one attorney for him in this capital murder case.

Although the United States Constitution provides that "[i]n all criminal prosecutions, the

accused shall . . . have the Assistance of Counsel for his defense", nothing in the Constitution

requires the appointment of multiple attorneys for any criminal prosecution, including capital cases.

To the extent that state law provides for appointment of multiple attorneys in some cases, it is not

"the province of a federal habeas court to reexamine state-court determinations on state-law

---

[7]  To the extent petitioner seeks to claim trial court error based on the witness' absence from trial, the Court finds that the trial court made no ruling to exclude the witness and thus made no error related to his absence at trial.

questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A petitioner is thus entitled to federal habeas relief due to trial error only if such error is not harmless, *i.e.* "the error 'had substantial and injurious effect or influence in determining the . . . verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (citation omitted).

> [U]nder *Brecht*, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had a substantial effect or influence in determining the verdict. We recognize, however, that if our minds are "in virtual equipoise as to the harmlessness," under the *Brecht* standard, of the error, then we must conclude that it was harmful.

*Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999) (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996)). To be entitled to federal habeas relief due to a trial error, petitioner must show the error actually prejudiced him. *Brecht*, 507 U.S. at 637.

Petitioner in this case has not shown that the trial court's failure to appoint multiple attorneys to work on his case prejudiced him. This claim entitles petitioner to no federal habeas relief.

## IX. INEFFECTIVE ASSISTANCE OF COUNSEL

As identified by respondent,[8] petitioner asserts in his first sixteen grounds for relief that his trial counsel rendered ineffective assistance by: (A) failing to call Michael Williams to testify at trial (Grounds 1 and 9); (B) failing to inform petitioner of the evidence and advise him regarding his defense (Grounds 2 and 3); (C) failing to review grand jury testimony (Ground 2); (D) failing to

---

[8] The Court utilizes respondent's list of claims because petitioner's numbered grounds for relief often duplicate each other and contain multiple claims of ineffective assistance within a particular ground for relief.

have petitioner brought before the grand jury (Ground 2); (E) failing to examine the crime scene and take photos (Ground 4); (F) failing to call Woods to testify (Grounds 2 and 14); (G) letting the jury believe that mere presence at the crime scene would make him guilty (Ground 5); (H) confusing the concepts of criminal conspiracy and law of the parties (Ground 5); (I) failing to present a letter written by Woods (Grounds 5, 6, and 7); (J) presenting false evidence with the State to convict him (Ground 7); (K) failing to use prior witness statements for purposes of impeachment (Ground 8); (L) failing to show what the State offered Tea-Leaf for his testimony (Ground 12); (M) failing to show that Tea-Leaf was on probation (Ground 12); (N) failing to request DNA testing of petitioner's clothes (Ground 13); (O) failing to request a second attorney (Grounds 10 and 15); and (P) failing to call an investigator to testify about witness statements (Ground 16).  Petitioner also asserts that defense counsel rendered ineffective assistance by (Q) failing to file motion for continuance so he could locate Michael Williams (Ground 9) and (R) failing to prepare for trial and only soliciting petitioner for plea bargain (Ground 11).

As previously mentioned, the Sixth Amendment provides criminal defendants a right to effective assistance of counsel during trial. U.S. CONST., art. VI.  To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective.  *Id.* at 696.  The Court may address the prongs in any order.  *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance."

18

*Strickland*, 466 U.S. at 689.  Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  *Id.* at 691.

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted).  Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel.  *Strickland*, 466 U.S. at 695-96.

Petitioners must "affirmatively prove prejudice."  *Id.* at 693.  They cannot satisfy the second prong of *Strickland* with mere speculation and conjecture.  *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992).  Conclusory allegations, furthermore, are insufficient to obtain habeas relief.  *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

Petitioner raises numerous claims of ineffective assistance of counsel.  Because some of these are directly refuted by the affidavit submitted by defense counsel with respect to petitioner's state habeas application, the Court separately considers those claims from the claims not directly refuted by such affidavit.

## A.  Claims Directly Refuted by Attorney Affidavit

The following claims were directly refuted in the state habeas proceedings:  (A) failing to call Michael Williams to testify at trial; (B) failing to inform petitioner of the evidence and advise him

regarding his defense; (E) failing to examine the crime scene and take photos; (F) failing to call co-defendant Woods to testify; (I) failing to present a letter written by Woods; (J) presenting false evidence with the State to convict him; (K) failing to use prior witness statements for purposes of impeachment; (N) failing to request DNA testing of petitioner's clothes; (O) failing to request a second attorney; (Q) failing to file motion for continuance so as to locate Michael Williams; and (R) failing to prepare for trial and only soliciting petitioner for plea bargain.

Before considering petitioner's state writ, the trial court secured an affidavit from defense counsel in which counsel averred:

> Prior to the jury trial, I asked Judge John Nelms to appoint Investigator Rex Reynolds to assist me in the case. Both myself and Mr. Reynolds interviewed many witnesses prior to trial. I also met with [petitioner] and discussed the case, and defenses thereto, on twelve occasions prior to the jury trial.
>
> . . .
>
> Mr. Reynolds went to the crime scene and on several occasions, we would go over the police reports and crime scene photographs. He informed me fully regarding the scene as it existed on the date of the offense. There was no additional need for me to visit the crime scene.
>
> Co-defendant, Adam Woods, was tried and convicted earlier in the year, and I had an opportunity to read his trial transcript in its entirety. [Petitioner] was made fully aware of the proposed State's case, and the theory of the prosecution. We discussed potential defense witnesses, and called those we felt could help the [petitioner's] case. The record will reflect that we thoroughly cross-examined each State's witness, and impeached much of their testimony. Police reports and affidavits previously furnished to us aided in this impeachment.
>
> Adam Woods, whose conviction was on appeal, sent a letter to [petitioner's] mother, in which we were furnished a copy. This letter was clearly hearsay and not admissible. Also, Michael Williams was interviewed by Mr. Reynolds. Williams was not at the scene at the time of the shooting, but merely saw many people standing near the crime scene. He could not testify that [petitioner] was not involved in this offense. Williams [sic] testimony would not have assisted the defense in any way.
>
> [Petitioner] also claims some form of "conspiracy" between myself and the Assistant District Attorney. This is certainly not true. I represented [petitioner] to the best of my abilities.
>
> [Petitioner] was arrested several days after this offense. Therefore, no additional lab testing on his body or clothing would be beneficial to [him]. Additionally,

20

> [petitioner] now suggests that a second attorney should have been appointed by the Court. The practice in Dallas County is to appoint a second attorney only when the Death Penalty is being sought by the State. The State did not seek the death penalty against [petitioner].
>
> [Petitioner's] Writ also states evidentiary matters and theories. These theories were made clear to the jury by myself during the course of the trial during jury arguments. The jury obviously chose to reject our theory of defense.

S.H. Tr. at 82-83. The trial court found counsel "trustworthy" and the statements in his affidavit "worthy of belief." *See id.* at 79. Such credibility finding is presumed correct unless petitioner rebuts it with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Petitioner has not shown clear and convincing evidence that overcomes the presumption of correctness, because the record simply does not support petitioner's allegations. The Court thus defers to the credibility finding of the state court and finds the factual statements by counsel credible. Based upon that affidavit, the Court finds no deficiency of counsel related to petitioner's claims of ineffective assistance A, B, E, F, I, J, K, N, O, Q, and R. With respect to Claim J, counsel specifically avers that he did not conspire with the State to secure petitioner's conviction. Such averment sufficiently covers the allegation that counsel presented false evidence with the State to convict petitioner. Petitioner, furthermore, has shown no material evidence presented against him to be false. With respect to the other claims directly refuted by the attorney affidavit, petitioner has demonstrated no prejudice from such alleged deficiencies of counsel. These claims entitle petitioner to no federal habeas relief.

Claims A, F, and I relate to alleged failures to call witnesses or proffer evidence that go to the crucial issue raised in this habeas action, *i.e.*, petitioner's involvement in the murders, if any, and therefore warrant further discussion. Based upon his affidavit, counsel certainly had credible reasons for not calling Woods or Michael Williams to testify at trial. As recited therein, an investigator

21

specifically explored whether Michael Williams could provide helpful testimony and determined that he was not present at the relevant time. Moreover, such determination is borne out by the trial testimony, which shows that no witness mentioned the presence of Michael Williams at any time.

As for the failure to call Woods to testify, counsel made a reasoned decision that his testimony would not help petitioner after reading his trial transcript in its entirety. Not only is such decision fully supported by counsel's submitted affidavit, but the appellate decision for Woods's criminal case fully supports the decision. In relevant part, that decision states:

> [A]ppellant [(Woods)] testified that after he and Hunt discussed the kilo of cocaine, Hunt left, saying said he would be back. Appellant went inside and got his .380 caliber semiautomatic pistol for protection. Bynum rode up on his bicycle and later Hunt, Jackson, and Stradford arrived on their motorcycles. Jones [(previously identified as "Devorick Jones")] pulled appellant aside and offered to help him by watching his back. Appellant agreed and told Jones to get appellant's nine millimeter handgun. According to appellant, Jones had handled the gun once before. Jones stayed inside the house.

> Appellant then escorted Hunt, Jackson, and Stradford inside the house. Jackson threw the money down on the table and said "Here it is." Appellant told Jones to count the money. While he did so, appellant retrieved the kilo of cocaine and handed it to Stradford. Jones said, "[T]his ain't no $17,000[;] it is too many small bills." According to appellant, Jackson then said, "Don't worry, you stupid ass nigger, this is the last money you will see." Appellant testified he thought Hunt, Jackson, and Stradford were going to rob him and that he was scared they were going to kill him. He then "saw through the bar like [Jackson] pull out a gun," so he pulled out his .380 and shot Stradford. Appellant testified he saw a gun in Stradford's hand but that Stradford did not fire any shots at him. There were other shots fired before and after appellant emptied his .380 but he did not know who shot them. According to appellant, he did not mean to kill Stradford, he just wanted Stradford to put the gun down.

> After the shooting was over, appellant and Jones picked up all the weapons and put them in a pillowcase. They also picked up the drugs, the money, appellant's cell phone, and keys. Appellant left to get his pick up truck which was parked down the street. When he returned, Jones did not have the money or the pillowcase with the weapons. Appellant assumed Jones took the money because "he is pretty-I guess you would say slick." Appellant never asked about the money because it wasn't his

money to start with.  The two men dragged the bodies and threw them in the truck bed.  They covered the bodies with a mattress and drove to a nearby field where they dumped them.

*Woods v. State*, No. 05-00-02017-CR, 2002 WL 1127420, at *5 (Tex. App. – Dallas May 30, 2002, pet. ref'd).  In light of the testimony Woods provided at his own trial, counsel most definitely did not render deficient representation by failing to call him at petitioner's trial.  What had been implicit from the attorney's affidavit, *i.e.*, that testimony from Woods would not be helpful to petitioner's case, becomes expressly obvious from a review of the testimony Woods gave at his own trial.  Even if Woods testified at petitioner's trial that petitioner was not involved in the murders, the State would have impeached him with his prior testimony that is severely damaging to petitioner's theory that he was not present at the scene.

As for the failure to present the letter written by Woods to petitioner's mother, counsel's affidavit provides a reasoned decision for not presenting the letter.  The trial record, furthermore, contains at least two instances where counsel for petitioner unsuccessfully attempted to admit similar statements by Woods.  *See* RR-III at 163-66 (sub rosa hearing regarding a statement by Woods to Tea-Leaf that Woods killed all three victims); RR-V at 54-58 (sub rosa hearing regarding a statement by Woods to Micah Rogers that Woods had "shot some people" and did not mention that petitioner was involved at all).  In each instance, the trial court deemed the statements to be inadmissible hearsay.  *See* RR-III at 166; RR-V at 58.  To render effective assistance, counsel need not continue to pursue the admission of evidence similar to that which the trial court has deemed inadmissible.   For the foregoing reasons, petitioner's claims of ineffective assistance A, B, E, F, I, K, N, O, Q, and R provide no basis for federal habeas relief.

23

**B.  Other Claims of Ineffective Assistance of Counsel**

Petitioner also claims that his attorney rendered ineffective assistance by (C) failing to review grand jury testimony; (D) failing to have petitioner brought before the grand jury; (G) letting the jury believe that mere presence at the crime scene would make him guilty; (H) confusing the concepts of criminal conspiracy and law of the parties; (L) failing to show what the State offered Timothy Williams for his testimony; (M) failing to show that Timothy Williams was on probation; and (P) failing to call an investigator to testify about witness statements.

Petitioner fails to show any prejudice with respect to Claims C, D, and P.  He does not show how the alleged failures to review grand jury testimony, to bring him before the grand jury, or to call an investigator to testify about witness statements affected the outcome of his trial.  He has not shown a reasonable probability that, but for these alleged deficiencies of counsel, the outcome of his trial would have been different.  These claims entitle petitioner to no habeas relief.

With respect to Claims G and H, the Court finds that the record simply does not support them.  As to Claim G, the trial court specifically instructed the jury that mere presence at the crime scene was insufficient to find petitioner guilty, *see* CR at 12.  In light of such instruction, counsel did not let the jury believe that mere presence at the scene was sufficient to convict petitioner.  As to Claim H, petitioner bases such claim on an appellate brief of the State which cites to a portion of the record which provides no support for finding any confusion on the part of counsel.  *See* Ground 5 of Pet. (citing to State's Brief at 10, which in turn cites to RR-IV at 15).  Petitioner thus shows no deficiency of counsel related to the alleged confusion.  Petitioner, furthermore, fails to show how the alleged confusion prejudiced him.  These claims thus entitle petitioner to no habeas relief.

With respect to Claims L and M, petitioner has shown no deficiency of counsel.  At the

24

outset of Tea-Leaf's trial testimony the State elicited testimony that he was on probation and that the State had informed him that, if he cooperated by being honest with the jury, such cooperation would be relayed to the prosecutor in his case, but that there was no other deal for his testimony. RR-III at 99-100. Despite that testimony, counsel interrogated Tea-Leaf regarding the "deal" he was working and the witness continued to deny any deal other than the one already disclosed. *See id.* at 133-37. During closing arguments, furthermore, counsel also hammered a potential deal that Tea-Leaf received for his testimony. *See* RR-VI at 19-20, 26. Counsel did not render deficient representation regarding what the State offered Tea-Leaf for his testimony or regarding the fact that Tea-Leaf was on probation.

In conclusion, the state disposition of petitioner's claims of ineffective assistance of counsel appears consistent with *Strickland*. For each of his numerous claims, petitioner has failed to show a deficiency of counsel, resulting prejudice from a deficiency of counsel, or both.

## X. EVIDENTIARY HEARING

Upon review of the pleadings filed herein and the proceedings held in state court as reflected in the state-court records, an evidentiary hearing appears unnecessary.

## XI. RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the Court **DENY** with prejudice the request for habeas corpus relief brought pursuant to 28 U.S.C. § 2254.

**SIGNED** this 23rd day of May, 2007.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

25

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on all parties by mailing a copy to each of them.  Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  Failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (*en banc*).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE